J-S65001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 563 EDA 2017 |

Appeal from the Order Entered February 6, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001044-2016,
CP-51-DP-0000155-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 566 EDA 2017 |

Appeal from the Order Entered February 6, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001046-2016,
CP-51-DP-0002590-2015

J-S65001-17

IN THE INTEREST OF: A.M.P., A  : IN THE SUPERIOR COURT OF
MINOR       :   PENNSYLVANIA
         :
         :
APPEAL OF: S.H., MOTHER  :
         :
         :
         :
         : No. 569 EDA 2017

Appeal from the Order Entered February 6, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0001045-2016,
CP-51-DP-0002591-2015

BEFORE:  OLSON, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:    **FILED NOVEMBER 21, 2017**

S.H., ("Mother") appeals from the decrees entered on February 6, 2017, granting the petitions filed by the Philadelphia Department of Human Services ("DHS" or the "Agency"), to involuntarily terminate her parental rights to her children:  J.J.H., a male born in March 2011,[1] and her two children with J.P. ("Father"), A.M.P., a female born in February 2013, and J.J.P., a male born in December 2015 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511.  In separate orders dated and entered on February 6, 2017, the trial court changed the Children's

---

[1] J.J.H.'s father, J.H., is deceased.  N.T., 2/6/17, at 8-9.

- 2 -

permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2] We affirm.

On November 2, 2016, DHS filed petitions for the involuntary termination of Mother's and Father's parental rights to the Children, and for the change of the Children's permanency goal to adoption. On February 6, 2017, the trial court held an evidentiary hearing on the termination/goal change petitions. DHS presented the testimony of Monica Cook, the supervisor of Bethanna, the Community Umbrella Agency ("CUA"); and Katrina Bridges, a CUA social worker who serves as the case manager for the Children. N.T., 2/6/17, at 17 and 64-65. Father and Mother testified on their own behalf.[3] *Id.* at 87 and 94.

The trial court fully set forth the factual and procedural background of this appeal, as follows:

> On September 13, 2014, [DHS] received a General Protective Services (GPS) report alleging that J.J.H. and A.M.P. were frequently left at home alone. The report also alleged Philadelphia Police were often called to the home to address incidents of domestic violence and that there were broken items

---

[2] In the decrees and orders entered on February 6, 2017, the trial court involuntarily terminated Father's parental rights to his two children, J.J.P. and A.M.P., and changed their permanency goal to adoption. Father has filed separate appeals from the termination decrees and change of goal orders at Docket Nos. 656 and 657 EDA 2017, respectively, which are not part of the appeals presently before this panel of the Court.

[3] Attorney Michael Graves, Jr., the court-appointed guardian *ad litem* ("GAL") representing the Children, was present at the termination/goal change hearing, but did not file a brief on behalf of the Children.

in the home as a result of the domestic violence. Mother and . . . [F]ather were often observed fighting on the streets. The report was substantiated.

On September 29, 2014, the family was referred for In-Home Protective Services (IHPS) to address the issues of drug abuse and domestic violence issues.

On October 17, 2014, DHS went to the home [and] learned that Mother was enrolled in a methadone maintenance program and treatment program being monitored by the Goodman Clinic. Mother received individual and group therapy. Mother was receiving dual diagnosis treatment at the Goodman [C]linic and had been recently incarcerated. Mother was on probation.

On October 18, 2014, DHS observed J.J.H. at the home of his father and learned J.J.H. was diagnosed as suffering from asthma and a heart murmur. J.J.H.'s father reportedly followed up with proper medical treatment at Children's Hospital of Philadelphia (CHOP)[.] J.J.H.'s father reported he had full custody of J.J.H. and Mother had supervised partial custody.

On October 24, 2014, the family began receiving IHPS through Turning Points for Children (TPFC).

On January 21, 2015, the family began receiving in-home services through [CUA], Bethanna.

On February 7, 2015, Bethanna attempted an initial visit [to the] family. Bethanna met A.M.P. and J.J.P.'s paternal grandmother who reported that Mother was not present and had taken A.M.P. with her. Bethanna scheduled another visit with the family on February 10, 2015.

On February 10, 2015, Bethanna met with the family. Bethanna observed that [Father's] behavior was volatile. [Father] and Mother engaged in a verbal altercation during a telephone call. [Father] verbally abused Mother during the telephone conversation while in A.M.P.'s presence. [Father] reported he was arguing with Mother because she did not take him to the methadone clinic.

[Father] reported Mother was using crack cocaine with her ex-boyfriend and had [begun] using crack cocaine one month

- 4 -

earlier. [Father] reported Mother had relapsed into drug use due to stress associated with the illness suffered by the [C]hildren's maternal great-grandmother. [Father] stated Mother was seeking a Protection from Abuse (PFA) order against him and he was unsure if he wanted to remain in the relationship.

On February 17, [2015,] Bethanna went to the family's home. Mother reported she had a chronic history of drug relapse triggered by stress and anxiety. Pursuant to the terms of Mother's probation, she reported she was mandated to attend dual diagnosis treatment and therapy. Mother reported she was on the waiting list for therapy at a methadone clinic. Mother further reported she gave her all her money to [Father] and was unable to establish contact with J.J.H[.]'s [f]ather to return J.J.H. to his care. Mother believed J.J.H.'s father had relapsed into cocaine use. Mother further explained the [C]hildren's [m]aternal [g]reat-[g]randmother was hospitalized suffering which was emotionally difficult for her.

On February 24, 2015, Bethanna learned that J.J.H. was residing with Mother during the week.

On March 3, 2015, Bethanna went to the home and learned that Mother had rendered a positive drug screen for benzodiazepines three weeks earlier. J.J.P. and A.M.P[.]'s [p]aternal [g]randmother ensured Bethanna [that Father] was not left alone with A.M.P. due to his diminished capacities.

On March 24, 2015, Bethanna conducted a home visit and observed that Mother appeared to be tired and was falling asleep at the visit. Mother became more alert as the visit progressed. DHS learned that Mother tested positive for benzodiazepines, cocaine[,] and opiates on April 29, 2015.

On May 6, 2015, Bethanna witnessed Mother sniffing shoe repair glue while supervising the children. Bethanna addressed these behaviors with [A.M.P.'s] [p]aternal [g]randmother, who agreed to ensure that Mother was not left alone with J.J.H. and A.M.P.

DHS learned that on May 15, 2015, Mother tested positive for [benzodiazepines], marijuana[,] and cocaine.

On May 19, 2015[,] Bethanna implemented a Safety Plan with Paternal Grandmother and Paternal Aunt which stated they

would ensure that J.J.H. and A.M.P. were not left alone with Mother. Paternal Grandmother and Paternal Aunt would provide line of sight supervision of J.J.H. and A.M.P. if either were not present in the home.

On June 9, 2015[,] Bethanna learned Father had rendered a positive drug screen for cocaine and reportedly used cocaine upon learning Mother was pregnant again.

DHS learned that on June 23, 2015, Mother tested positive for five different drugs including methadone.

On July 1, 2015[,] Bethanna went to the home. Bethanna informed Mother she was observed with A.M.P. and J.J.H. without supervision of J.J.P. and A.M.P.'s [p]aternal [g]randmother. J.J.P. and A.M.P.'s [p]aternal [g]randmother reported she was with the family at the time but left to use the restroom. Bethanna reiterated that J.J.P. and A.M.P.'s [p]aternal [g]randmother must supervise Mother with the children at all times.

DHS learned that on August 3, 2015, Mother tested positive for [c]ocaine, [benzodiazepines], marijuana, fentanyl and opiates.

On August 14, 2015, Bethanna went to visit the family and found A.M.P. and J.J.H. unsupervised at a swimming pool with Mother.

DHS learned that on August 19, 2015, Bethanna implemented a Safety Plan with Paternal Grandmother and Paternal Aunt.

On August 26, 2015, Bethanna learned that Mother attended a prenatal appointment at Thomas Jefferson University Hospital on August 20, 2015 and her current pregnancy was diagnosed as high risk.

On September 22, 2015, DHS filed a Dependent Petition for J.J.H. and A.M.P. based on the ongoing issues of drug abuse, domestic violence and lack of appropriate supervision in the home.

[On] October 1, 2015, an Adjudicatory Hearing for J.J.H. and A.M.P. was held before the Honorable Vincent L. Johnson. Judge Johnson ordered CUA to locate J.J.H. and A.M.P. for placement with the agency. The [c]ourt ordered police assistance was to

- 6 -

be afforded, if necessary. The address and location of the children was ordered to be kept confidential. Judge Johnson further ordered Mother to refrain from contact with J.J.H. and A.M.P. except during court-ordered visits. Mother was referred to [C]linical Evaluation Unit (CEU) for a drug screen, dual diagnosis assessments and weekly drug screen. Judge Johnson ordered a Parenting Capacity Evaluation (PCE). DHS subsequently learned that Mother tested positive for benzodiazepines and methadone at the CEU.

On October 5, 2015, J.J.H. and A.M.P. were placed in the home of their [m]aternal aunt and uncle through Bethanna.

[In] November 2015, J.J.H.'s father died.

On December 14, 2015, J.J.H.'s [p]aternal [g]randparents filed a motion to intervene pursuant to custody of J.J.H.

On December 17, 2015, a Permanency Review hearing for A.M.P. and J.J.H. was held before Judge Johnson, who ordered A.M.P. and J.J.H. remain committed to DHS. Mother was re-referred to the CEU for a drug screen, dual diagnosis assessments, monitoring, and three random drug screens prior to the next court date. The [c]ourt found that Mother had exhibited no [compliance] with the permanency plan. It was reported Mother was not attending Family School. [T]he [c]ourt ordered that Family School make note of how many time[s] Mother fell asleep during the Family School session. The [c]ourt ordered Mother's Family School sessions be suspended if she continued to "nod off" in class. CUA was directed to provide the Child [A]dvocate with the documentation of Mother's participation in drug and alcohol treatment.

[In] December 2015[,] Mother gave birth to J.J.P. at the Hospital of the University of Pennsylvania (HUP).

On December 21, 2015[,] DHS received a GPS report which alleged that Mother and J.J.P. tested positive for opiates at the time of J.J.P.'s birth. . . . J.J.P. was born [at] 37 weeks and five [days'] gestation weighing six pounds and 12 ounces. Mother was involved in a car accident prior to J.J.P.'s birth. Mother had violated the conditions of her parole and was incarcerated for 45 days. Mother was released from incarceration on November 12, 2015. The report was determined to be valid.

On December 23, 2015, DHS made a visit to the Hospital of University of Pennsylvania (HUP) and met with Mother. Mother stated she had been prescribed opiates, however [she] could not provide proof of the prescription. DHS observed that Mother appeared to [be] under the influence of an unknown substance.

DHS learned that on at least two other occasions, Mother was under the influence of drugs when she visited J.J.P.

On January 14, 2016, J.J.H.'s paternal grandparents filed an amended motion to intervene.

On January 15, 2016, DHS learned that Mother was often disruptive when she attended therapy at the Goldman Clinic. Mother rendered a positive drug screens in December 2015 and January 2016.

On January 21, 2016, J.J.P. was ready to be discharged from the hospital. DHS obtained an Order of Protective Custody (OPC) and J.J.P. was placed in the Lutheran Children and Family Service foster home.

At the Shelter Care hearing for J.J.P. held on January 22, 2016, the Court lifted the OPC, ordered the temporary commitment to DHS stand. Mother was referred to Clinical Evaluation Unit (CEU) for drug screen, an assessment and monitoring. The [c]ourt ordered Mother to receive three random drug screens unless she actively participat[ed] in a treatment program.

On January 29, 2016, an Adjudicatory Hearing for J.J.P. was held before the Honorable Lyris F. Younge[,] who discharged J.J.P.'s temporary commitment to DHS, adjudicated him dependent and committed him to DHS. Judge Younge ordered Mother referred to the CEU for monitoring and a drug screen. DHS was ordered to assess the appropriateness of a mother/baby drug treatment program for Mother and J.J.P. Mother was granted twice weekly supervised visits.

On February 29, 2016, a Motion Hearing for J.J.H. was held before Judge Younge, who denied the motion to intervene and ordered that J.J.H. remain as committed to DHS.

On March 17, 2016, a Permanency Review Hearing for J.J.H., A.M.P.[,] and J.J.P. was held before Judge Younge, who ordered that they remain committed to DHS. As to J.J.H., Judge Younge ordered that Mother be referred to the Behavioral Health System (BHS) for an evaluation and a consultation. As to all three children, Judge Younge ordered that Mother's visits [be] suspended until the next court date after Mother was escorted from the courtroom after she displayed erratic behavior during the hearing. Judge Younge found that Mother was regularly attending a methadone maintenance program at the Goldman Clinic and had been successfully discharged from treatment at the Kirkbridge Center, and ordered that the Goldman Clinic provide treatment reports to CUA for the next court hearing.

On April 26, 2016, J.J.H. and A.M.P. were moved to a foster home through A Second Chance after it was learned that J.J.H. and A.M.P. were seen in an automobile and at a methadone clinic with Mother.

On June 2, 2106, a Permanency Review Hearing for J.J.H., A.M.P.[,] and J.J.P. was held before Judge Younge[,] who ordered that the [C]hildren remain committed to DHS. Judge Younge ordered the judicial removal of J.J.H. and A.M.P. from their foster home. Judge Younge ordered the foster parents be prohibited from any contact or visits with J.J.H. and A.M.P. Judge Younge issued a Stay Away Order as to the foster parents who reportedly threatened [] the entire CUA (Bethanna) agency including the CUA social worker and social worker supervisor. Judge Younge ordered the foster parents['] home never to be considered as a foster home in the future. Mother was referred to CEU for drug screens and her visits were suspended until further order of the [c]ourt. Mother was ordered to obtain and provide documentation of her participation in a drug and alcohol treatment program and submit it to the Court. The [C]hildren's addresses were ordered to remain confidential.

On September 1, 2016, a Permanency Review Hearing for J.J.H., A.M.P.[,] and J.J.P. was held before Judge Younge[,] who ordered the [C]hildren remain as committed to DHS. The [c]ourt found that Mother had been sentenced to three years of additional probation pursuant to a violation of her probation. Judge Younge further noted Mother attended an outpatient drug and alcohol treatment program at the Goldman Clinic and had been discharged from the Achieving Reunification Center (ARC).

Mother was referred to CEU for drug screens, monitoring and random drug screens prior to the next court date. Mother's visits remained suspended until further order of the [c]ourt. The [c]ourt ordered no family members be considered as placement resources for J.J.H., A.M.P.[,] and J.J.P.

The matter was the listed on a regular basis before judges of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and evaluated for the purpose of reviewing the permanency plan of the [Children].

In subsequent hearings, the Dependency Review Orders reflect the [c]ourt's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

On February 6, 2017, during the Termination of Parental Rights Hearing for [M]other, the Court found by clear and convincing evidence that Mother's parental rights of J.J.H., A.M.P.[,] and J.J.P. should be terminated pursuant to the Juvenile Act. Furthermore, the [c]ourt held it was in the best interest of the [C]hildren that the goal be changed to [a]doption.

Trial Court Opinion, 7/19/17, at 1-6.

In decrees and orders entered on February 6, 2017, the trial court involuntarily terminated Mother's parental rights to the Children and changed their permanency goal to adoption. On February 12, 2017, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with regard to the termination decrees and goal change orders. On March 1, 2017, this Court, acting *sua sponte*, consolidated Mother's appeals.

In her brief on appeal, Mother raises the following issues:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother [] pursuant to 23

Pa.C.S.A. [§] 2511(a)(1) where Mother presented evidence that she tried to perform her parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) where Mother presented evidence that she has remedied her situation by maintaining housing, taking parenting classes and intensive drug treatment counselling and has the present capacity to care for her children[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) where evidence was provided to establish that the [C]hildren were removed from the care of the Mother and Mother is now capable of caring for her children[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) where evidence was presented to show that Mother is now capable of caring for her children after she completed parenting classes, secured and maintained housing and continued her drug treatment program[?]

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother [] pursuant to 23 Pa.C.S.A. [§] 2511(b) where evidence was presented that established the [C]hildren had a close bond with [] Mother and [they] had lived with [] Mother for the most part of their lives. Additionally, Mother consistently visited with her children when she was permitted to visit them]?]

Mother's Brief at 7.[4]

---

[4] Mother waived any challenge to the change of the Children's permanency goal by her failure to raise the issue in her concise statement and in the statement of questions involved in her brief on appeal. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal).

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As [] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The *R.J.T.* Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider section 2511(a)(1) and (2) together, as did the trial court. Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 13 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated:

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following

elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

With regard to a parent's incarceration, in *In re Adoption of S.P.*, our Supreme Court reiterated the standard of analysis pursuant to section 2511(a)(1) for abandonment and added as follows:

> [a]pplying [*In re: Adoption of McCray*,] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [331 A.2d 652, 655 (Pa. 1975)]. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*
>
> . . .
>
> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable

firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d at 828 (quoting *In re: Adoption of McCray*, 331 A.2d at 655 (footnotes and internal quotation marks omitted in original)). Further, the Supreme Court stated, "incarceration neither compels nor precludes termination of parental rights." *In re Adoption of S.P.*, 47 A.3d at 828 (adopting this Court's statement in *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010)).

The Supreme Court addressed the relevance of incarceration in termination decisions under section 2511(a)(2) as follows:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 947 A.3d at 829.

After revisiting its decision in *In re: R.I.S.*, 36 A.3d 567 (Pa. 2011), regarding incarcerated parents, the Supreme Court stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties"); [*In re:*] *E.A.P.*, [944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated

incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d at 830-31.

With regard to section 2511(a)(1), Mother challenges the sufficiency of the evidence to support termination, claiming that the evidence at the hearing clearly demonstrated that she had taken substantial steps toward satisfying her Family Service Plan ("FSP") objectives, and did not act with a settled purpose of relinquishing her parental rights or refuse to perform her parental duties. Mother's Brief, at 10 and 15. Mother states that she has completed her parenting goal and was attending domestic violence classes. *Id.* at 15. Mother also states that she was visiting the Children regularly when she was permitted to do so.

With regard to section 2511(a)(2), Mother challenges the sufficiency of the evidence to support termination, as she claims that she has remedied the conditions that caused the placement [of the] Children by substantially completing her FSP goals of attending parenting classes, attending visitation with the Children, and attending domestic violence classes. *Id.* at 10 and 15-16. Mother states that she visited regularly with the Children, when she was permitted to visit, and that she has completed her inpatient treatment

at the Goldman Clinic and continues to attend treatment at the clinic. **_Id._** at

16. Mother claims that she is now able to care for the Children and provide

a safe home for herself and the Children. **_Id._**

In its opinion, the trial court stated as follows:

To satisfy § 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six (6) months prior to filing of the termination petition, which reveal a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. It is clear from the record that for a period of six (6) months leading up to the filing of the Petition for Involuntary Termination, [M]other failed to perform parental duties for the [C]hildren. The [c]ourt found by clear and convincing evidence that [M]other refused or failed to perform her parental duties.

In the instant matter, the social worker testified Mother lacked the ability to complete her Single Case Plan objectives of maintaining and achieving sobriety from substance abuse problems, complying with court ordered Parenting Capacity Evaluation, certificate from Family School, visitation and housing. Furthermore[,] the social worker testified there were issues with domestic violence. The social worker testified Mother was referred to ARC[;] however[, she] did not complete parenting courses[.] Evidence was offered to show ARC discharged Mother due to noncompliance. Furthermore [the] social worker testified Mother's lack of engagement in the Single Case meetings was an issue due to lack of sobriety.

The social worker testified [to] concern Mother tested very high positive in October 2015 for [benzodiazepines] as the case initiated. Furthermore, the social worker testified there were inconsistencies in the level of use of [benzodiazepines] throughout the life of the case. Testimony revealed concern Mother was using additional substances aside from [benzodiazepines] as well as methadone.

A parent has an affirmative duty to act in her children's best interest. "Parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith

interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re Dale A., II*, 683 A.2d 297, 302 (Pa. Super. 1996). In reference to the parental contact, "to be legally significant, the contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship, and must demonstrate and willingness and capacity to undertake the parenting role". *In re D.J.S.*, 737 A2d 283, 286 (Pa. Super. 1999) (quoting *In re Adoption of Hamilton*, 549 A.2d 1291, 1295 (Pa.Super. 1988)).

In the present matter, J.J.H. and A.M.P. have been in DHS custody for [27] months and J.J.P. has been in custody for [13] months []. The testimony of [the] social worker stated Mother's behavior necessitated several changes in the [C]hildren's placement on several occasions. The social worker's testimony revealed [M]other made in inappropriate statements during visits with the [C]hildren and visits were suspended by Court Order[.] Furthermore, [the] social worker testified Family School was discontinued by [the c]ourt order after a report was submitted regarding Mother's erratic behavior and lack of sobriety in the sessions. The social worker testified Family School reported Mother fell asleep in the restroom attending to A.M.P.'s needs. Furthermore, [the] social worker's testimony revealed concern for [the] safety and stability for [the C]hildren due to Mother's frequent incarcerations in prison.

Section 2511(a)(2) requires that "repeated and continued incapacity, abuse neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the condition and causes of the incapacity, abuse, neglect, or refusal, cannot or will not be remedied by the parent. 23 Pa.C.S.A. § 2511 (a)(2).

Termination of parental rights under § 2511(a)(2) is not limited to affirmative misconduct but may include acts of refusal, as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

The [c]ourt's decision was reflective of testimony which revealed Mother's struggle with drug [addiction] and minimal progress

with treatment. Moreover, the [c]ourt found Mother's repeated and continued inappropriate behavior in [c]ourt and specifically during visits with the [C]hildren.

. . .

For the foregoing reasons, the [c]ourt finds that the [DHS] met its statutory burden by clear and convincing evidence regarding the termination of parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) [and] (2)[.]

Trial Court Opinion, 7/19/17, at 6-8 and 9 (some internal citations omitted).

After a careful review of the record, it is clear that the trial court's conclusion that Mother failed to perform parental duties with regard to the Children, and its termination of her parental rights under section 2511(a)(1), are supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827. Likewise, we find that the trial court's conclusion regarding section 2511(a)(2) is supported by clear and convincing evidence. *Id.* Specifically, Mother has demonstrated a repeated and continued incapacity, abuse, neglect or refusal that has caused the Children to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother. Thus, we find no abuse of discretion in the trial court's termination of Mother's parental rights to the Children pursuant to section 2511(a)(1) and (2).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to

section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

> With regard to section 2511(b), the trial court stated the following:

> In order to terminate the parental rights, the party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. 23 Pa.C.S. § 2511(b); *In re Bowman*, 647 A.2d 217 (Pa. Super. 1994). The best interest of the child is determined after consideration of the needs and welfare of the child. The trial court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of [her] parental rights to determine if the evidence, in the light of the totality of the circumstances, clearly warrant[s] involuntary termination.

> When determining the best interest of the child, many factors are to be analyzed, "such as love, comfort, security, security and stability. *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). Another factor that a court is to consider is what, if any, bond exist[s] for the child. *In re Involuntary Termination of C.W.S.M[.] and KA.L.M.*, 839 A.2d 410, 415 (Pa. Super 2003).

Pursuant to Section 2511(b), the trial court must take [into] account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000).

Here, [the] social worker testified [that] J.J.H, A.M.P.[,] and J.J.P. were placed in the same home and bonded with each other and their foster parent. Furthermore, the social worker testified[,] the [C]hildren were placed in a foster home willing to provide permanency for all three children together.

The [c]ourt found the social [worker's] testimony to be credible. The [c]ourt stated concern about Mother's struggles with drug addiction and the full gravity of her addiction. The [c]ourt reasoned it [*sic*] decision on the lack stability of Mother's parental capacity and insight in this particular matter. The [c]ourt referenced DHS records of repeated domestic violence issues which Mother admitted in her testimony. The [c]ourt found convincing the evidence introduced where Mother posted case information on public access social media after a stern warning from the [c]ourt. The [c]ourt expressed concern for the safety of the parties and court personnel in the courtroom due to [the] inflammatory nature of the comments and information Mother posted on social media to undermine the integrity of the judicial process. The [c]ourt held Mother in contempt of a previous [c]ourt [o]rder preventing[] the use of social media by Mother. Mother was incarcerated for 60 days for the violation. The [c]ourt also issued an [o]rder of [p]rotection for the social workers assigned to the case. The Court also ordered a [s]tay [a]way order for Mother and her family due to the threats produced by Mother on social [media]. The [c]ourt expressed grave concern regarding Mother's inappropriate behavior, inappropriate actions and exercise of poor judgement[*sic*][.] The [c]ourt expressed a safety concern if the [C]hildren were reunified with Mother. Hence, the [c]ourt concluded [that] the [C]hildren would not suffer irreparable or detrimental harm if Mother's rights were involuntary[*sic*] terminated.

The [t]rial [c]ourt found by clear and convincing evidence that [DHS] met [its] statutory burden pursuant to 23 Pa.C.S.A. § 2511 (a) (2), (5), (8) & (b) and that it was in the best interest of the [C]hildren[] to change their goal to adoption[.]

. . .

> For the foregoing reasons, the [c]ourt [found] that [DHS] met its statutory burden by clear and convincing evidence regarding the termination of parental rights pursuant to 23 Pa.C.S. § 2511(b). Furthermore, the [c]ourt [found] that its ruling will not cause J.J.H., A.M.P.[,] and J.J.P. to suffer irreparable harm and it is in the best interest of the [C]hildren based on the testimony regarding the [C]hildren's safety, protection, mental, physical and moral welfare, to terminate [M]other's parental rights.

Trial Court Opinion, 7/19/17, at 8-9 (some internal citations omitted).

Mother argues that DHS failed to satisfy the statutory requirements for termination under section 2511(b). Mother asserts that the two older children lived with her for most of their lives, and that all three of the Children have a bond with her. Mother's Brief at 12 and 18. Mother contends that she "should have been provided with realistic goals that would have permitted her [to have] unsupervised visitation with her children." *Id.* at 18. Mother urges that the requirements of section 2511(b) are not met because the best interests of the Children are not served by termination of her parental rights. *Id.*

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.,*** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child

is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). Here, the trial court

appropriately considered the safety of the Children as weightier than any affection the young children might feel for Mother.

Further, this Court has held that a parent's love of her child, alone, does not preclude a termination. ***See In re L.M.***, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." ***In re Adoption of C.L.G.***, 956 A.2d at 1007 (citing ***In re Z.S.W.***, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record, we find that termination of Mother's parental rights to the Children was warranted pursuant to section 2511(b), as the evidence showed that the Children's developmental, physical and emotional needs and welfare will best be met by the termination of Mother's parental rights. Further, the evidence showed that there is no bond between Mother and the Children that is worth preserving. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Mother's parental rights to the Children under section 2511(b). ***In re Adoption of S.P.***, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27.

Additionally, we find Mother's contention, in relation to subsection (b),

that DHS did not set reasonable goals for her to meet is akin to her arguing that DHS did not make reasonable efforts to reunify the Children with her. *See* Mother's Brief, at 18. When reviewing a termination decree on appeal, we do not consider whether DHS made reasonable efforts. Our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. *See In the Interest of: D.C.D., a Minor*, 105 A.3d 662, 673-674, 676 (Pa. 2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and rejecting the suggestion that section 2511 of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly section 6351(f)(9)(iii)). Thus, based on our Supreme Court's holding in *In the Interest of: D.C.D., a Minor*, we find no merit to Mother's argument.

We, therefore, affirm the trial court's decrees terminating Mother's parental rights to the Children, and the orders changing the Children's permanency goal to adoption.

Decrees and orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/21/2017*